# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CHARLES E. MACK,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:09cv00051 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

### I. Background and Standard of Review

Plaintiff, Charles E. Mack, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2003 & Supp. 2009).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and §  1383(c)(3).  This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mack protectively filed his current application for SSI on November 9, 2004, alleging disability as of November 1, 2001, based on seizures, hypertension and problems with his heart and right leg. (Record, ("R."), at 216, 282-84, 290.)[1] The claim was denied initially and upon reconsideration. (R. at 270-74, 275, 277-79.) Mack then requested a hearing before an administrative law judge, ("ALJ"). (R. at 280.) The ALJ held a hearing on March 23, 2006, at which Mack was represented by counsel. (R. at 227-31.) By decision dated May 2, 2006, the ALJ awarded a closed period of benefits. (R. at 458-60.) After the ALJ issued his decision, Mack pursued his administrative appeals, and the Appeals Council granted his request for review and remanded his claim to the ALJ. (R. at 461-64.)

Subsequent to remand, an additional hearing was held on March 5, 2008, at which Mack was represented by counsel.(R. at 174-210.) By decision dated March 27, 2008, the ALJ denied Mack's claim for benefits. (R. at 214-26.) The ALJ found that Mack had not engaged in any substantial gainful activity since November 9, 2004. (R. at 216.) The ALJ found that the medical evidence established that Mack had severe impairments, namely ischemic heart disease, hypertension, chronic obstructive

---

[1]Mack filed a previous application for SSI on February 26, 2002. (R. at 48-51.) That claim was denied originally and on reconsideration. (R. at 33-37, 39, 40-41.) After a hearing, Mack's claim was denied. (R. at 11-19.) Mack pursued his administrative appeals, and the Appeals Council denied his request for review. (R. at 3-5.) Mack appealed the denial of benefits to this court, and, by Memorandum Opinion and Final Judgment entered July 21, 2004, this court affirmed the Commissioner's decision denying benefits. (R. at 465-85.)

pulmonary disease, ("COPD"), with tobacco abuse, a history of seizure disorder, gastroesophageal reflux disease and degenerative joint/disc disease, but he found that Mack's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 216-21.) The ALJ also found that Mack had the residual functional capacity to perform light[2] work that did not require climbing ladders, ropes or scaffolds, concentrated exposure to temperature extremes and respiratory irritants or exposure to hazards such as machinery or heights and only occasional use of ramps, climbing of stairs, balancing, stooping, kneeling, crouching or crawling. (R. at 222-24.) The ALJ found that Mack could not perform any of his past relevant work. (R. at 224-25.) Based on Mack's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Mack could perform, including light jobs as a product inspector, a grader/sorter and a hand packager and sedentary[3] jobs as a surveillance system monitor and a bench worker. (R. at 225-26.) Thus, the ALJ found that Mack was not under a disability as defined under the Act and was not eligible for benefits. (R. at 226.) *See* 20 C.F.R. § 416.920(g) (2009).

After the ALJ issued his decision, Mack pursued his administrative appeals, but the Appeals Council denied his request for review. (R. at 165-68, 171.) Mack

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 416.967(b) (2009).

[3]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2009).

then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2009). The case is before this court on Mack's motion for summary judgment filed on January 12, 2010, and the Commissioner's motion for summary judgment filed February 5, 2010.

## II. Facts

Mack was born in 1958, (R. at 282), which, at the time of the ALJ's decision, classified him as a "younger" individual under 20 C.F.R. § 416.963(c). Mack testified that he finished the ninth grade. (R. at 182.) Mack's past relevant work experience includes jobs as a landscaper, a general laborer for a construction company and a trailer park manager. (R. at 182.)

At his 2008 hearing, Mack testified that he was still suffering from one to two blackouts a week, which could be seizures or as a result of his high blood pressure. (R. at 188, 191.) Mack testified that he had trouble breathing, especially when walking up steps. (R. at 193-94.) Mack also testified that he suffered from chest pain on an almost daily basis, which required him to sit down and rest for two to three hours to recover. (R. at 198-99.) Mack stated that he continued to have problems with an ankle that he broke and had surgically repaired in 2003. (R. at 202-03.)

Gina Baldwin, a vocational expert, also testified at the hearing. (R. at 205-09.) Baldwin classified Mack's job as trailer park manager, as performed, as a skilled position requiring very heavy[4] exertion and his landscaping job as an unskilled position

---

[4]Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of items weighing 50 pounds or more. If someone can do very heavy work, he also can do heavy, medium, light and sedentary work. *See* 20 C.F.R. § 416.967(e) (2009).

requiring heavy[5] exertion. (R. at 206-07.)  Baldwin was asked to assume a person of Mack's age, educational level and work background who had the residual functional capacity to perform light work that did not require more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling and that did not require climbing ladders, ropes or scaffolds, exposure to hazards such a dangerous machinery or heights, or concentrated exposure to extreme cold or heat, odors, dust, gasses or poor ventilation. (R. at 207.) Baldwin testified that such an individual could not perform any of Mack's past relevant work, but could perform work as a product inspector, a grader/sorter, a surveillance system monitor, a bench worker and a hand packager. (R. at 208.) Baldwin stated that an individual who could stand and walk for less than two hours and sit for less than two hours in and eight-hour workday could not perform competitive, full-time employment. (R. at 209.) Baldwin also stated that if an individual missed more than two days of work a month, he could not perform competitive, full-time work. (R. at 209.)

In rendering his decision, the ALJ reviewed  medical  records from Dr. Abdul-Latief Almatari, M.D., of Stone Mountain Health Services, ("Stone Mountain"); Dr. Paul Augustine, M.D., of Stone Mountain; Dr. Marissa Vito-Cruz, M.D., of Stone Mountain; Dr. Jill K. Couch, D.O., of Stone Mountain; Dr. Michael J. Winsor, M.D., of Associated Neurologists of Kingsport; Dr. Randall Hays, M.D., a state agency physician; Lee Regional Medical Center; Cardiovascular Associates; Dr. Kevin Blackwell, D.O.; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Michael J. Hartman, M.D., a state agency physician; E. Hugh Tenison, Ph.D., a state agency psychologist; and Joseph Leizer, Ph.D., a state agency psychologist.  Mack's attorney

---

[5]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. § 416.967(d) (2009).

submitted additional medical records from Stone Mountain to the Appeals Council.[6]

The relevant time period for this claim is from the protective filing date, November 9, 2004, to the date of the ALJ's decision, March 27, 2008. Earlier and subsequent medical evidence is summarized here only insofar as it is relevant to the relevant period.

The record reflects that Mack sought treatment beginning in 2002 for a seizure disorder of unknown etiology and hypertension. (R. at 101-03.) Mack complained of one recent seizure and one eight years earlier. (R. at 103.) The physician who treated Mack, Dr. Abdul-Latief Almatari, M.D., was unsure whether Mack's seizures were the result of an allergic reaction to cold medication or if the seizures were the result of alcohol withdrawal. (R. at 102-03.) A CT scan of Mack's brain conducted on January 30, 2002, revealed evidence of mild cerebral atrophy, which was not very common in a person of Mack's age. (R. at 104.) Dr. Almatari recommended that Mack quit consuming alcohol and offered to send Mack for substance abuse assistance. (R. at 98.) Mack told Dr. Almatari that he had no plans to quit drinking anytime soon. (R. at 99). Records from this time period also show that Mack's hypertension was adequately controlled with medication. (R. at 98-99.)

After seeing Dr. Almatari on only two occasions, and with no report of further seizures, Mack contacted Stone Mountain on March 5, 2002, and requested a letter to be used in attempt to receive disability benefits. (R. at 98.) Dr. Almatari's letter in response to this request documents his treatment of Mack, but it does not say that

---

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 2f-2g), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Mack's condition imposed any limitations on Mack's work-related abilities. (R. at 97.)

Dr. Michael Winsor, M.D., a neurologist, evaluated Mack on May 1, 2002, upon referral from Dr. Almatari. (R. at 668-70.) Mack stated he suffered from seizures in 1988, but had not suffered from any seizures from 1989 until January 2002. (R. at 668.) Mack informed Dr. Winsor that he suffered from two seizures in one night in January, another seizure about a week prior to his visit and another seizure two night prior to his visit. (R. at 668.) Mack stated that he would pass out during these seizures. (R. at 668.) According to others, his body would stiffen and he frothed at the mouth. (R. at 668.)

Mack stated that he had suffered from multiple head traumas and accidents in the past, but that none required treatment in an emergency room or admission to a hospital. (R. at 668.) Dr. Winsor reported that Mack admitted drinking a six-pack of beer and smoking a pack and a half of cigarettes daily. (R. at 668-69.) The record shows that Mack told Dr. Winsor that he was diagnosed with hypertension in January 2002 and indicated that he had depression and nervousness, ringing in his ears for the past two years, dizziness and general body weakness. (R. at 669.) Mack informed Dr. Winsor that the only medication he took was Atenolol. (R. at 669.)

Upon examination, Dr. Winsor found that Mack was alert, pleasant and cooperative. (R. at 669.) The physical examination revealed that Mack's blood pressure was normal, that he had good muscle strength and bulk in his arms and legs, that he could walk on his toes and heels and that he could tandem walk. (R. at 669-70.) Mack had decreased pin prick and temperature sensation in his ankles, but position sensation and vibration sensation were intact. (R. at 670.) Mack experienced difficulty with heel-shin coordination, but finger-nose coordination was done well. (R. at 670.) Dr. Winsor also noted that Mack's breath smelled of alcohol and that he had a blood alcohol level

of "368." (R. at 670.)

Dr. Winsor opined that Mack's peripheral neuropathy, heel to shin ataxia and seizure disorder were related to alcohol overuse. (R. at 670.) Dr. Winsor ordered an MRI and an EEG to look for other possible causes of the seizures. (R. at 670.) Dr. Winsor prescribed Dilantin and informed Mack that he could not drive under Virginia law until he was seizure-free for at least six months. (R. at 670.) An MRI of Mack's brain, conducted on May 17, 2002, was unremarkable aside from mild diffuse cortical atrophy. (R. at 666.) The EEG, conducted on May 17, 2002, was normal EEG awake, in drowsiness and brief sleep with low voltage activity generally associated with tranquilizing, sedating or proprietary analgesic drugs. (R. at 666.)

Dr. Winsor continued to treat Mack through December 2002. (R. at 107.) On December 3, 2002, Dr. Winsor noted that Mack had not had any seizures since April 2002. (R. at 107.) Dr. Winsor's reports show that Mack's seizure disorder and hypertension were controlled on medication. Dr. Winsor placed no restrictions on Mack's work-related activities other than to inform him that under Virginia law he could not drive. (R. at 670.)

Mack was seen regularly at Stone Mountain Health Clinic since 2002. The medical records reflect that Mack was seen every couple of months or so from 2002 through January 2009. (R. at 91-102, 369-391, 771-805, 831-62, 875-906.) These records show that Mack's hypertension and seizure disorder were controlled by medication. (R. at 376, 378, 379, 771, 792, 843, 856, 883, 888, 906.) In fact, the only references to recurrent seizures in these records are on June 9, 2003, when Mack stated that his last seizure was six months earlier; on August 24, 2004, when Mack stated that his last seizure was eight months earlier; and on May 5, 2005, when Mack stated that

his last seizure was five months earlier. (R. at 370, 374, 384-85.) It is interesting to note that the medical records in closer proximity to these dates do not reflect any complaints of recurrent seizure activity. Except for his initial visit in January 2002, it does not appear that Mack has ever sought any medical treatment close to the time he reports that he has suffered a seizure. The records also reflect that Mack's physicians repeatedly advised him to stop consuming alcohol and smoking. (R. at 379, 384, 386-87, 389-90.) Mack refused any efforts at substance abuse treatment. (R. at 376, 387, 775.)

On January 22, 2004, Mack denied suffering from any acute problems or complaints. (R. at 379.) He also specifically denied any recurrent seizure activity. (R. at 379.) He continued to deny recurrent seizure activity through July 2006. (R. at 783.) On May 5, 2005, Mack reported that he stopped drinking on February 10, 2005. (R. at 370.) By September 14, 2005, he had returned to drinking, although at a decreased level. (R. at 801.) On May 11, 2006, Mack complained of feeling depressed on occasion. (R. at 790.) He denied any other complaints on that day. (R. at 790.) He was given a prescription for Zoloft. (R. at 790.)

The record shows that Mack suffered a fracture of his right ankle in 2003 that required open reduction and internal fixation. (R. at 431-34.) The ankle fracture healed, and the internal hardware was removed on May 27, 2004. (R. at 445.)

On January 7, 2005, Dr. Michael J. Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Mack. (R. at 446-52.) Dr. Hartman stated that Mack could occasionally lift or carry items weighing up to 50 pounds and frequently lift and carry items weighing up to 25 pounds. (R. at 447.) Dr. Hartman stated that Mack could stand and/or walk for about six hours and sit for about six hours in and eight-hour workday. (R. at 447.) Dr. Hartman stated that Mack

could never climbs ladders, ropes or scaffolds or work around hazards such as dangerous machinery or heights. (R. at 448-49.) On March 8, 2005, Dr. Richard M. Surrusco, M.D., reviewed and agreed with Dr. Hartman's assessment. (R. at 450.)

Mack was seen on July 14, 2006, at the Emergency Department of Lee Regional Medical Center complaining of chest pain. (R. at 713-32.) Mack's treating physician recommended that he be admitted for further testing, but Mack refused and was discharged home against medical advice. (R. at 713-15.) An x-ray taken of Mack's lungs did show some evidence of mild chronic obstructive lung disease. (R. at 714.)

On July 27, 2006, Mack saw Dr. Marissa Vito-Cruz, M.D., of Stone Mountain. (R. at 778-79.) Dr. Vito-Cruz noted that Mack was returning for follow-up on his recent complaints of chest pain. (R. at 778.) Mack told Dr. Vito-Cruz that he had been diagnosed with epilepsy as a child. (R. at 778.) Dr. Vito-Cruz referred him to a cardiologist for further evaluation. (R. at 779.)

On August 22, 2006, Mack was evaluated by Dr. Anthony Haney, M.D., of Cardiovascular Associates, P.C. (R. at 743-45.) Mack reported intermittent chest pain over the past few years. (R. at 743.) An electrocardiogram, ("EKG"), showed signs of an old inferior myocardial infarction. (R. at 743.) Mack reported that he continued to smoke a pack and a half of cigarettes a day and consumed five beers a day. (R. at 743.) Dr. Haney ordered additional testing. (R. at 745.)

Mack saw Dr. Vito-Cruz again on September 8, 2006. (R. at 774.) Mack stated that his chest pain had subsided. (R. at 774.) He complained that his "nerves" were "getting really bad." (R. at 774.) Mack admitted that he continued to drink, and his mother reported that he drank "constantly." (R. at 774.) Mack told Dr. Vito-Cruz that

he continued to work, but was paid "under the table." (R. at 774.)  In fact, Mack said that he had worked this way in construction for the past 19 years. (R. at 774.) Dr. Vito-Cruz noted that Mack's liver enzyme levels were "extremely abnormal." (R. at 774.)

Mack returned to see Dr. Haney on September 14, 2006. (R. at 733-34.)  Mack reported doing well with no further episodes of chest pain. (R. at 733.)  Dr. Haney noted that EKG, echocardiogram and nuclear stress testing all showed signs that Mack had suffered an old myocardial infarction. (R. at 734.)

Dr. Kevin Blackwell, D.O., conducted a consultative examination of Mack at the state agency's request on September 15, 2006. (R. at 746-50.) Mack told Dr. Blackwell that he had suffered a heart attack on July 17, 2006, which had left the bottom of his heart "dead." (R. at 746.)  Mack stated that he experienced chest pain "every once in a while." (R. at 746.)  Mack also complained on shortness of breath, with and without chest pain, and upon exertion. (R. at 746.)  Mack also told Dr. Blackwell that he continued to suffer from seizures once a month. (R. at 746.) Mack complained of pain in his legs, but did not complain of any back pain. (R. at 746.)

Dr. Blackwell's examination revealed normal results, with the exception of Mack's subjective complaints.  (R. at 746-50.)  Dr. Blackwell stated that Mack was capable of lifting items weighing up to 50 pounds occasionally and up to 20 pounds frequently. (R. at 749.)  Dr. Blackwell stated that Mack should avoid heavy exertional activities, but that he could sit for eight hours and stand for eight hours in an eight-hour workday. (R. at 749.)  He also stated that Mack should avoid ladder climbing because of his seizure disorder. (R. at 749.)

On September 20, 2006, Dr. Frank M. Johnson, M.D., a state agency physician,

completed a Physical Residual Functional Capacity Assessment on Mack. (R. at 751-57.)  Dr. Johnson found that Mack could lift and carry items weighing up to 50 pounds occasionally and up to 25 pounds frequently. (R. at 752.)  Dr. Johnson also found that Mack could sit for about six hours and stand/walk for about six hours in an eight-hour workday. (R. at 752.)  Dr. Johnson stated that Mack could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 753.) Dr. Johnson also stated that Mack should avoid concentrated exposure to extreme cold and heat, fumes, odors, dust, gases and poor ventilation and avoid even moderate exposure to hazards such as machinery or heights. (R. at 754.)

E. Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on September 20, 2006. (R. at 758-70.)  Tenison found that Mack did not suffer from a severe mental impairment. (R. at 758.)  Tenison also stated that Mack experienced no mental functional limitations. (R. at 768.)

On November 27, 2006, Dr. Vito-Cruz noted that Mack was doing "remarkably well." (R. at 771.)  Mack noted that his seizures were in "good control." (R. at 771.) Other than some difficulty sleeping, Mack had no complaints. (R. at 771.)

On March 1, 2007, state agency physician Dr. Hartman completed another Physical Residual Functional Capacity Assessment of Mack. (R. at 810-16.) Dr. Hartman stated that Mack could occasionally lift or carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 811.)  Dr. Hartman stated that Mack could stand and/or walk for about six hours and sit for about six hours in and eight-hour workday. (R. at 811.)  Dr. Hartman stated that Mack could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 811.)  Dr. Hartman also stated that Mack should avoid concentrated exposure to extreme heat and cold and

fumes, odors, dusts, gases and poor ventilation and avoid even moderate exposure to hazards such as machinery and heights. (R. at 813.)

Joseph Leizer, Ph.D., a state agency psychologist, completed a PRTF on March 1, 2007. (R. at 817-30.) Leizer found that Mack did not suffer from a severe mental impairment. (R. at 817.) Leizer also stated that Mack experienced no mental functional limitations. (R. at 827.)

Mack started seeing Dr. Jill Couch, M.D., of Stone Mountain on June 1, 2007. (R. at 860-62.) Dr. Couch noted that Mack's hypertension and seizures were under control. (R. at 860.) Mack returned to see Dr. Couch with no complaints on July 2, 2007. (R. at 856.) On September 27, 2007, Mack's hypertension and seizure disorder remained controlled, but he complained of intermittent low back pain of two months' duration. (R. at 851.) Mack noted that Advil or Aleve helped his back pain. (R. at 851.) Dr. Couch noted that Mack's back was not tender, and she ordered x-rays of his back. (R. at 850.) X-rays of Mack's back taken on October 1, 2007, showed a compression fracture at the T-4 level with mild degenerative changes and lumbar disc spaces within normal limits. (R. at 849.)

Mack saw Dr. Couch of Stone Mountain on December 26, 2007, with complaints of sinus drainage in the morning. (R. at 843.) Mack did not complain of any back pain on this date. On February 26, 2008, Dr. Couch completed a Medical Opinion Re: Ability To Do Work-Related Activities (Physical). (R. at 835-38.) In this assessment, Dr. Couch stated that Mack could lift and carry items weighing up to only 10 pounds occasionally and less than 10 pounds frequently. (R. at 835.) Dr. Couch stated that Mack could stand and walk and sit less than two hours in an eight-hour workday. (R. at 835.) Dr. Couch stated that Mack could sit for only five minutes at a time and stand

for only 10 minutes at a time before having to walk around for a least five minutes. (R. at 836.)  Dr. Couch also stated that Mack would have to lie down at unpredictable intervals during his work shift. (R. at 836.)  She stated that Mack could never twist, stoop, crouch, climb stairs or ladders or be exposed to extreme heat and cold, humidity, noise, fumes, odors dusts, gases or poor ventilation and hazards such as machinery or heights. (R. at 836-37.) Dr. Couch stated that Mack should avoid even moderate exposure to wetness.  (R. at 837.) Dr. Couch also stated that Mack's impairments or treatment would cause him to be absent from work more than three times a month. (R. at 838.)  Dr. Couch provided no additional bases for her opinions, other than her office notes. (R. at 835-38.)

Dr. Couch saw Mack again on March 25, 2008, and Mack voiced no complaints. (R. at 888.) In fact, Dr. Couch noted that Mack was in no acute distress and looked well. (R. at 888.) On May 23, 2008, Mack voiced no complaints other than nasal congestion and  midthoracic back pain which worsened when he mowed the yard. (R. at 883.)  On June 26, 2008, Dr. Couch noted that an x-ray of Mack's back had shown an old compression fracture at the T-4 level with mild degenerative changes. (R. at 878.) Mack continued to complain of back pain despite taking anti-inflammatories. (R. at 878.) Dr. Couch prescribed Darvocet-N 100 for Mack's complaints. (R. at 877.)

D. Kaye Weitzman, a licensed clinical social worker with Stone Mountain, performed an evaluation of Mack on March 24, 2008. (R. at 869-74.) Mack told Weitzman that he suffered from right leg damage and seizures. (R. at 869.) Mack also stated that he suffered from medication side effects such as dizziness, drowsiness, fatigue, lethargy and stomach upset. (R. at 869.)  Weitzman stated that Mack was tearful off and on during the evaluation and very anxious. (R. at 869.) Weitzman noted that Mack experienced a pervasive loss of interest in almost all activities, decreased energy,

feelings of guilt or worthlessness, generalized persistent anxiety, somatization unexplained by organic disturbance, mood disturbance, recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress, apprehensive expectation, paranoid thinking or inappropriate suspiciousness, substance abuse, emotional withdrawal or isolation, vigilance and scanning and sleep disturbance. (R. at 870.) Weitzman stated that Mack was unable to meet competitive standards or had no useful ability to function in all areas of mental abilities and aptitudes to perform work except for a seriously limited, but not precluded, ability to ask simple questions or request assistance, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 871-72.)

Weitzman stated that Mack suffered from a seizure disorder that caused pain and pain in his right leg on a regular basis. (R. at 872.) Weitzman also stated that Mack experienced marked restrictions of activities of daily living and marked deficiencies of concentration, persistence or pace. (R. at 873.) Weitzman further stated that Mack experienced extreme difficulties in maintaining social functioning. (R. at 873.) Weitzman stated that Mack had a then-current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. (R. at 873.) She also stated that Mack's impairments or treatment would cause him to miss more than four day of work a month. (R. at 873.) Weitzman stated that Mack's impairment had lasted or was expected to last more than 12 months. (R. at 873.) Weitzman placed Mack's then-current Global Assessment of Functioning, ("GAF"), score at 35, with his highest GAF in the past year at 40.[7] (R. at 369.)

---

[7]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 31 to 40 indicates "[s]ome impairment in

Mack again saw Weitzman on July 28, 2008. (R. at 956.) Mack stated, "I have a lot of old injuries and a whole lot of pain." (R. at 956.) Mack said, "the medicines dull the pain, but nothing really helps me." (R. at 956.) Weitzman noted that Mack was in a sad mood with an anxious affect. (R. at 956.) On August 25, 2008, Mack complained of sadness and really bad back pain after serving as a pallbearer for one of his best friend's the week before. (R. at 954.)

Mack returned to see Dr. Couch on August 27, 2008. (R. at 905-06.) Mack had no complaints other than occasional wheezing. (R. at 906.) Mack specifically denied any muscle aches. (R. at 906). Dr. Couch ordered pulmonary function studies. (R. at 906.) On October 24, 2008, Dr Couch noted that these studies showed severe obstruction. (R. at 903.)

On September 29, 2008, Mack told Weitzman that he was having more problems breathing. (R. at 951.) Mack also complained of being tired all the time as well as continuing to experience grief over his friend's recent death. (R. at 951.)

Mack saw Dr. Couch on December 31, 2008, and again on January 22, 2009, with gastrointestinal complaints. (R. at 895-902.) A CT scan taken of Mack's abdomen on January 27, 2009, showed rather extensive artherosclerosis of the coronary arteries and proximal renal arteries bilaterally. (R. at 908-09.)

Mack saw Weitzman again on February 2, 2009. (R. at 950.) Mack complained of hurting bad in his right shoulder as a result of the weather. (R. at 950.) Weitzman noted that Mack exhibited a sad mood and affect. (R. at 950.) Weitzman completed a

---

reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. ..." DSM-IV at 32.

Mental Impairments Questionnaire on that date as well. (R. at 943-48.) Weitzman stated that Mack suffered from back, neck, hip and right shoulder pain. (R. at 943.) Mack also stated that he suffered from medication side effects such as dizziness, fatigue and stomach pain. (R. at 943.) Weitzman stated that Mack complained of worsening stress. (R. at 943.) Weitzman noted that Mack experienced a pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, blunt, flat or inappropriate affect, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, psychomotor agitation or retardation, apprehensive expectation, seclusiveness or autistic thinking, emotional withdrawal or isolation, intense and unstable interpersonal relationships and impulsive and damaging behavior, flight of ideas, vigilance and scanning, sleep disturbance and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring the average of at least once a week. (R. at 944.) Weitzman stated that Mack was unable to meet competitive standards or had no useful ability to function in all areas of mental abilities and aptitudes to perform work except for a seriously limited, but not precluded, ability to understand, remember and carry out very short and simple instructions and to adhere to basic standards of neatness and cleanliness. (R. at 945-46.) Weitzman stated that Mack suffered from poor concentration and limited abilities to move around with pain, causing increased irritability. (R. at 945.) Weitzman stated that Mack's depression and panic increased his sense of pain. (R. at 946.)

Weitzman also stated that Mack experienced marked restrictions of activities of daily living and marked to extreme difficulties in maintaining social functioning and deficiencies of concentration, persistence or pace. (R. at 947.) Weitzman further stated that Mack experienced one or two repeated episodes of decompensation within a 12-month period, each of at least two weeks duration. (R. at 947.) Weitzman stated that

Mack suffered from a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. (R. at 947.) She also stated that Mack's impairments or treatment would cause him to miss more than four day of work a month. (R. at 947.) Weitzman stated that Mack's impairment had lasted or was expected to last at least 12 months. (R. at 947.) Weitzman placed Mack's then-current GAF score at 35, with his highest GAF score in the past year being 45.[8]

On February 20, 2009, Dr. Couch completed another Medical Opinion Re: Ability To Do Work-Related Activities (Physical). (R. at 939-42.) In this assessment, Dr. Couch stated that Mack could lift and carry items weighing only 10 pounds occasionally and less than 10 pounds frequently. (R. at 939.) Dr. Couch stated that Mack could stand and walk and sit less than two hours in an eight-hour workday. (R. at 939.) Dr. Couch stated that Mack could sit for only 15 minutes at a time and stand for only 20 minutes at a time before having to walk around for a least 20 minutes. (R. at 940.) Dr. Couch also stated that Mack would have to lie down at unpredictable intervals up to three times during his work shift. (R. at 940.) Dr. Couch stated that Mack had back pain with numbness and tingling that radiated into his right leg which supported this findings. (R. at 940.) She stated that Mack could occasionally twist, stoop and climb stairs and never crouch, climb ladders or be exposed to extreme heat and cold, wetness, humidity, fumes, odors, dusts, gases or poor ventilation and hazards such as machinery or heights. (R. at 940-41.) Dr. Couch stated that Mack's severe COPD supported these limitations. (R. at 941.) Dr. Couch also stated that Mack's impairments or treatment would cause him to be absent from work more than three

_____

[8]A GAF of 41-50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

times a month. (R. at 942.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 27, 2008, the ALJ denied Mack's claim for benefits. (R. at 214-26.) The ALJ found that Mack had not engaged in any substantial gainful activity since November 9, 2004. (R. at 216.) The ALJ found that the medical evidence

established that Mack had severe impairments, namely ischemic heart disease, hypertension, COPD with tobacco abuse, a history of seizure disorder, gastroesophageal reflux disease and degenerative joint/disc disease, but he found that Mack's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 216-21.) The ALJ also found that Mack had the residual functional capacity to perform light work that did not require climbing ladders, ropes or scaffolds, concentrated exposure to temperature extremes and respiratory irritants or exposure to hazards such as machinery or heights and only occasional use of ramps, climbing of stairs, balancing, stooping, kneeling, crouching or crawling. (R. at 222-24.) The ALJ found that Mack could not perform any of his past relevant work. (R. at 224-25.) Based on Mack's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Mack could perform, including light jobs as a product inspector, a grader/sorter and a hand packager and sedentary jobs as a surveillance system monitor and a bench worker. (R. at 225-26.) Thus, the ALJ found that Mack was not under a disability as defined under the Act and was not eligible for benefits. (R. at 226.) *See* 20 C.F.R. § 416.920(g).

Mack argues that the Appeals Council erred in rejecting the opinions of Weitzman and by failing to properly explain the weight given to her opinions. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 9.) Mack further argues that the ALJ erred by not giving the appropriate weight to the opinion of his treating physician, Dr. Couch. (Plaintiff's Brief at 9.) Mack also argues that the ALJ erred by failing to find that his condition met the requirements for substance addiction disorder, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09. (Plaintiff's Brief at 9.)

As stated above, the court's role in this case is to determine if substantial evidence exists in the record to support the Commissioner's decision to deny benefits and whether the Commissioner's decision was reached through application of the correct legal standards. *See Coffman*, 829 F.2d at 517. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Mack argues that the ALJ in this case erred by rejecting the restrictive assessments of Dr. Couch. I find no error in the ALJ's weighing of the evidence. The ALJ rejected Dr. Couch's assessment because it was not consistent with her own reports and clinical findings. (R. at 224.) Dr. Couch's notes repeatedly reflect that Mack's hypertension and seizures were under control with medication. (R. at 851, 860.) *See*

*Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling[]"). Mack complained of back pain to Dr. Couch on one occasion prior to Dr. Couch's completion of her February 26, 2008, assessment considered by the ALJ, and, according to Mack, his back pain at that time was eased by taking over-the-counter analgesics. (R. at 851.) Also, two days before the ALJ issued his opinion, Mack saw Weitzman and did not complain of any back pain. (R. at 888.)

Mack also argues that the Appeals Council erred by rejecting the opinions of Weitzman and in failing to explain its reasoning for doing so. The reports of Weitzman were provided to the Appeals Council on Mack's request for review of the ALJ's decision denying benefits. The Appeals Council's decision notes that it considered the evidence, but stated simply that it did not provide a basis for changing the ALJ's decision. (R. at 165-66, 168.) Again, I find no error. This court has specifically held that the Appeals Council is not required to specifically state its reasons for finding that new evidence did not justify a review of an ALJ's decision. *See Ridings v. Apfel*, 76 F. Supp. 2d 707, 710 (W.D.Va. 1999).

Weitzman completed two assessments, both of which were provided to the Appeals Council. The first assessment was the result of her first consultation with Mack on March 24, 2008, and, therefore, was not based on an ongoing treating relationship. The second assessment, dated February 2, 2009, was based on Mack's condition 11 months after the ALJ's decision. According to these assessments, Mack suffered from serious mental health problems, which, if true, left him barely able to function. Weitzman's opinions as to Mack's work-related abilities, however, are completely inconsistent with the other evidence of record and Weitzman's own notes.

Mack did complain of depression to his treating physician in 2006, and he prescribed Zoloft. (R. at 790.) Later that same year, he complained that his nerves were "getting bad." (R. at 774). There is no indication, however, that his treating physician referred him for mental health evaluation or treatment or prescribed any further medication. Furthermore, on this same date, Mack told his physician that he continued to work "under the table" and had done so for the past 19 years. (R. at 774.) In fact, the only clinical findings that Weitzman listed in her treating notes were a "sad mood with anxious affect" or "sad mood with sad affect," and these notes appeared over a period of time when Mack was dealing with the death of a close friend. (R. at 954-55.) Furthermore, while Weitzman's February 2009 assessment is based, in part, on recurrent severe panic attacks, this psychological symptom is mentioned no other place in the record. (R. at 944.) Also, Mack's counsel incorrectly argues that Weitzman was Mack's "treating psychologist," but it appears Weitzman is a licensed clinical social worker.

Mack also argues that the ALJ erred by failing to find him disabled under the listed impairment for substance addiction disorders. To qualify as disabled under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09, a claimant must suffer from behavioral changes or physical changes associated with the regular use of substance that affect the central nervous system and which results in meeting a listed impairment for organic mental disorders under §12.02, depressive syndrome under § 12.04, anxiety disorder under § 12.06, personality disorder under §12.08, peripheral neuropathy under §11.14, liver damage under section § 5.05, gastritis under § 5.00, pancreatitis under §5.08 or seizure disorder under §11.02 or § 11.03. There is no dispute but that Mack suffers from a long-standing addiction to alcohol and that he has continued to consume alcohol against his physicians' advice. Therefore, Mack meets the first requirement of

§12.09. With regard to the requirement that his alcoholism has resulted in the meeting of another listed impairment, Mack argues that his condition meets the listings for seizure disorder under §11.02. This section requires that a claimant suffered seizures "documented by detailed description of a typical seizure pattern, including all associated phenomena, occurring more frequently than once a month." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.09 (2009). As stated above, the record in this case does not contain any such documentation. Instead, Mack's seizures appear to be well-controlled on his medication.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the Commissioner's weighing of the evidence and findings with regard to Mack's residual functional capacity;

2. Substantial evidence exists to support the ALJ's finding that Mack's impairment does not meet the criteria of the listed impairment found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09; and

3. Substantial evidence exists to support the ALJ's finding that Mack was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Mack's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final

decision of the Commissioner denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 2nd day of June 2010.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE